IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

FILED

MAR 17 2015

CLERK, US DISTRICT COURT
NORFOLK, VA

CMA CGM S.A.,

    Plaintiff,

v.                                    Civil Action No. 2:14cv135

DECKWELL SKY (USA) INC., d/b/a
MONARCH CONTAINER LINE,

    Defendant.

## OPINION & ORDER

This matter is before the Court on Plaintiff CMA CGM S.A.'s ("Plaintiff") Motion for Summary Judgment, Doc. 19, Defendant Deckwell Sky (USA) Inc.'s ("Defendant") Motion to Strike and Motion in Limine, Docs. 21, 25, and the subsequent bench trial held before this Court on February 24, 2015. For the reasons explained herein, the Court **GRANTED** the Motion for Summary Judgment as to liability on all counts, **DENIED** Defendant's pretrial Motions, and, having received sufficient evidence at trial, **FINDS** Defendant **LIABLE** to Plaintiff in the total amount of $438,910.66.

### I. BACKGROUND

#### A. Procedural History

Plaintiff filed its Complaint against Defendant on April 4, 2014, alleging five counts. Doc. 1. Counts Four and Five were dismissed voluntarily on June 4, 2014. Doc. 12. Count One alleges Breach of Contract "for all demurrage and storage charges;" Count Two alleges Breach of Contract to recover "freight and associated charges;" and Count Three alleges violation of the "Carriage of Goods by Sea Act." Doc. 1 at 5–6.

Plaintiff filed its Motion for Summary Judgment on January 22, 2015. See Doc. 19. On January 30, 2015, Defendant filed its Response. Doc. 23. Plaintiff's Reply was filed on February 5, 2015. Doc. 28. Argument on that Motion was heard at the Final Pretrial Conference on February 10, 2015 and the Court ruled from the bench in Plaintiff's favor as to liability.

A bench trial for the purpose of determining the appropriate amount of damages took place on February 24, 2015. Doc. 38. Based on the Court's prior summary judgment ruling, the parties filed a trial stipulation stating Plaintiff "is entitled to demurrage charges from July to December of 2013." Doc. 39. The Court heard evidence and argument from both sides but withheld a ruling on the exact amount of damages pending the issuance of this Order. Doc. 38.

### B. Undisputed Facts Established for Summary Judgment[1]

Plaintiff is a foreign company operating as a "common carrier providing ocean transportation services for containerized cargo worldwide." Doc. 20 at 1–2. Defendant, doing business as "Monarch Container Line," is considered a Non-Vessel Operating Common Carrier ("NVOCC"). Id. at 2.

Plaintiff and Defendant entered into a service contract ensuring that Plaintiff would reserve sufficient space for Defendant's cargo on its vessels in exchange for Defendant's guarantee to ship at least a certain amount of cargo over the life of the contract. Id. This contract was formed sometime in April 2013. Id.

In a related transaction, which took place in May or June 2013, Defendant contracted with Kumquat Tree, Inc. ("Kumquat"), represented by an individual identified as "John Chen," to

---

[1] The facts laid out in this section are those that were available to the Court, and uncontested by Defendant, when it considered Plaintiff's Motion for Summary Judgment. At that time, the Court **FOUND** that these facts were sufficient to establish Defendant's liability for all three types of damages discussed below; however, the Court also noted that the evidence was insufficient to determine the proper amount of damages. See infra Part III.A. Further factual findings, based solely on the evidence and testimony offered at trial, are integrated below as necessary to explain the Court's holding as to damages. See infra Part III.B.1–3.

ship thirteen containers from Oakland, California to the Port of Tianjin, China. Id. at 3. To effectuate its deal with Kumquat, Defendant booked passage for these thirteen containers under the terms of its contract with Plaintiff in three separate shipments. Id. The documentation provided by Kumquat indicated that the thirteen containers held "auto parts," and Defendant passed this description along to Plaintiff. Id.

The final shipment left Oakland on or about June 28, 2013. Id. at 5. On July 5, 2013, after two of the shipments had arrived safely in China, Defendant notified Plaintiff that it was having difficulty reaching its consignee and that the cargo "may be abandoned."[2] Plaintiff responded on July 9, 2013, informing Defendant that it would be liable for any costs associated with the cargo being abandoned. Id. Defendant responded by requesting a quote for a change of destination. Id. at 5–6. Plaintiff immediately informed Defendant that a change of destination was impossible because the containers had already been discharged from the vessel in China and were "under Customs' custody." Id. at 6, Ex. 18.

Unable to change destinations, Defendant requested that Plaintiff provide a quote for the costs of abandonment or re-exportation. Id. at 6. Plaintiff provided an estimated cost to destroy the cargo, id. at Ex. 21, but Defendant refused to pay this amount, id. at Ex. 22. Two weeks passed without Defendant instructing Plaintiff on how to proceed with the cargo. Id. at 7.

On July 29, 2013, Defendant informed Plaintiff that it had learned that the cargo may not be "auto parts" but, instead, "used tires." Id. at 7, Ex. 23. The parties continued to exchange e-mail communication over the next two weeks, and Defendant again requested re-exportation of the containers, which Plaintiff refused pending confirmation of the true contents of the

---

[2] Although Plaintiff cautiously indicates that Defendant thought abandonment was merely a possibility, the evidence cited appears more certain. The Exhibit in question purports to be an e-mail message informing Plaintiff "that these shipments have been abandoned by shipper." Doc. 20 at Ex. 15. Furthermore, Defendant's employee, Eric Ngo, stated that "[w]e have been trying to contact shipper for past 3 weeks, but they never get back to us." Id.

containers. Id. at 8. On August 12, 2013, Defendant confirmed that the containers were loaded with "used tires" and not "auto parts." Id. at 8, Ex. 29. Importing used tires into China is illegal, a fact known to both parties, and Defendant maintains that it did not know the cargo was misidentified until after arrival in China. Id. at 8. Furthermore, Defendant concedes that Plaintiff had no knowledge of the problem. Id. at 12.

Given that the cargo was an illegal import, Plaintiff asked Defendant if it was prepared to proceed with destruction of the cargo. Id. Defendant refused, claiming the costs estimated by Plaintiff were "way too high," and yet again requested re-exportation. Id. at Ex. 30. Plaintiff denied this request on the grounds that destruction "was the only viable option" and advised Defendant of the costs that would likely be incurred. Id. at 8–9. Defendant responded that same day, August 14, 2013, that it would "try to find shipper[, Kumquat,] and relay the charges." Id. at 9, Ex. 33.

On October 8, 2013, after nearly two months of silence, Plaintiff sent follow-up notice providing a cost estimate for destruction and alleging Defendant's liability for those costs if the cargo was to be officially abandoned. Id. at 9, Ex. 34. Defendant responded, again rejecting the cost estimations as unnecessarily high and instead requesting a quote for returning the cargo to the United States. Id. at 9, Ex. 35. Plaintiff denied this request, stating that if Defendant wished to take action aside from destruction, it should do so at its "own costs, risks and responsibilities." Id. at 9, Ex. 36.

Finally, in an effort to retain Defendant as a long-term customer, Plaintiff offered to effectuate re-exportation of the cargo on the condition that Defendant paid the costs incurred in storage and customs. Id. at 10. Defendant refused this offer, citing the alleged delay in offering re-exportation on Plaintiff's part as the cause of the majority of the storage costs. Id. at 10, Ex.

38. Negotiations broke down further, and Defendant informed Plaintiff of its intent to file a report with the Federal Maritime Commission if Plaintiff did not agree "to assume reasonable responsibility for its serious mishandling of this shipment." Id. at 10, Ex. 39.

The parties agreed that Plaintiff's contractual obligations over the cargo terminated upon safely reaching the Port of Tianjin. Id. at 10. Defendant admitted that it is responsible for unpaid "ocean freight and associated charges." Id. at 11, 14. Although the proper amount remained in dispute, Defendant also admitted that it is responsible under the parties' service contract for some amount of demurrage charges.[3] Id. at 11.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50 (1986); Terry's Floor Fashions v. Burlington Indus., 763 F.2d 604, 610 (4th Cir. 1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. Celotex, 477 U.S. at 322–24. Such facts must be presented in the form of exhibits and sworn affidavits. Failure to rebut the motion with such evidence will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates

---

[3] "Detention" is defined by the service contract as "the charge [Defendant] pays for detaining [Plaintiff's] equipment outside the port, terminal or depot, beyond the free time." Doc. 20 at Ex. 1. "Demurrage" is similarly defined as "the charge, related to the use of the equipment only, [Defendant] pays for [Plaintiff's] equipment kept beyond the free time allowed by [Plaintiff] for taking delivery of goods in the port, terminal or depot . . . include[ing] storage and equipment costs." "Free time" is "the period of time allowed to the merchant free of charge." Doc. 20 at Ex. 4.

5

the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

A mere scintilla of evidence is insufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Although the court must draw all justifiable inferences in favor of the nonmoving party, in order to successfully defeat a motion for summary judgment, a nonmoving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." Doyle v. Sentry Ins., 877 F. Supp. 1002, 1005 (E.D. Va. 1995) (citing Celotex, 477 U.S. at 324).

**B. Bench Trial**

At trial, a plaintiff must prove, by the preponderance of evidence, that it has suffered damages due to the defendant's breach of contract and violation of maritime law. This burden is to prove "with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery." Shepherd v. Davis, 574 S.E.2d 514, 524 (Va. 2003). Accordingly, a plaintiff must show two elements for each type of damages claimed: (1) "a causal connection between the defendant's wrongful conduct and the damages asserted;" and (2) "the amount of those damages by using a proper method and factual foundation for calculating damages." Saks Fifth Avenue, Inc. v. James, Ltd., 630 S.E.2d 304, 311 (Va. 2006).

## III. ANALYSIS

As a general proposition, nobody wants to own 325 metric tons of used tires;[4] the parties in this case are no exception. Plaintiff does not accuse Defendant of knowingly misrepresenting its cargo, and it appears clear to the Court that both parties in this case are the victims of a fraud perpetrated by "John Chen" and Kumquat, the original shipper of the used tires.[5] That being said, the Court must still determine, as between the parties now before it, where the legal responsibility should lie for the misrepresentation of the cargo and the significant expenses which followed.

---

[4] By 1982, used tires were already recognized as "a problem that won't go away." Stewart Levin, Recycling Used Tires: A Boon or a Balloon, THE CHRISTIAN SCIENCE MONITOR (Sept. 21, 1982), available at http://www.csmonitor.com/1982/0921/092139.html. By 1990, the federal courts were already presented with individuals charged with implementing complex fraudulent schemes to abandon large shipments of used tires in the hands of trucking companies. See, Lisa Ellis, Man Pleads Guilty To 23 Counts In Tire-disposal Scheme, PHILLY.COM (Oct. 30, 1990), http://articles.philly.com/1990-10-30/news/25894511_1_tire-disposal-wire-fraud-western-union. No later than 1997, would-be fraudsters were targeting unsuspecting NVOCCs as a method for relieving themselves of used tires at a fraction of the cost of doing so legally. See Yang Ming Marine Transp. Corp. v. Okamoto Freighters Ltd., 259 F.3d 1086, 1089 (9th Cir. 2001) (ten containers shipped to Tokyo, Japan "held used tires instead of cigars and cigarettes"). The instant case and recent situations like it are living proof that this illegal practice continues to plague companies and nations alike. See, e.g., Joe McDonald, China Recycling Cleanup Jolts Global Industry, ASSOCIATED PRESS (Oct. 3, 2013), available at http://news.yahoo.com/china-recycling-cleanup-jolts-global-industry-062315875--finance.html ("Despite a ban on imports of used tires, [Chinese] inspectors intercepted a 115-ton shipment of them in March [of 2013] . . . labeled 'recycled rubber bands'").

[5] During his seemingly brief negotiations with Defendant to arrange the booking of the fateful shipment, "John Chen" specifically identified one shipping line that Defendant was not to use, allegedly due to "very high demurrage and detention." Trial Ex. 9 at 1. Since "Mr. Chen" obviously had no intention of paying any such costs, however, inferentially this request must have been based on his knowledge that the carrier he identified would have been more likely to discover the fraud prior to shipment. Presumably this would be accomplished through a corporate policy leading to inspection of the original trucking company's bill of lading, which when eventually consulted correctly identified the cargo as "used tires." See Trial Test. of Ms. Yang; Trial Ex. 24. In this case, the burden was on Defendant to check the trucker's bill of lading, but by the time they did so it was too late. Under the terms of the contract, Defendant certified Kumquat's description of the cargo, accordingly, as between Plaintiff, the carrier, and Defendant, a NVOCC, the risk of misidentified cargo falls upon Defendant. However, Plaintiff's rights are no better than a NVOCC's ability to bear the burden of damages caused by a shipper's fraud. Therefore, whenever possible, both carrier and NVOCC should check the trucker's bill of lading to minimize the risk of such fraud. In Yang Ming Marine Transp. Corp. v. Okamoto Freighters Ltd., 259 F.3d 1086 (9th Cir. 2001), a similar improper shipment of used tires resulted in destruction costs of approximately $25,000 for ten containers. Id. at 1089. Here, the destruction costs for thirteen containers of tires were over $200,000. This raises the question of whether the cost of dealing with used tires has multiplied several times over in the last decade and a half or whether the fraudulent scheme has reached across the ocean to artificially inflate the cost of destroying the tires. Based upon the Court's research into similar cases, see supra note 4, and the representations of counsel, it appears the scheme of shipping garbage unbeknownst to either carrier or NVOCC is not a rare occurrence. Therefore, until a profitable method for recycling used tires is developed, it behooves both carriers and NVOCCs to check behind the original shipper's certification of the cargo.

### A. Liability

Defendant did not dispute any of the asserted facts supporting its general liability pursuant to each of the three Counts of the Complaint: Breach of Contract (Counts 1 & 2) and Violation of the Carriage of Goods by Sea Act (Count 3). Accordingly, there exists no genuine issue of material fact in dispute on the topic of liability. First, Defendant admitted responsibility for misrepresenting the cargo as "auto parts." (Counts 1 & 3). See Doc. 28 at 2. Second, Defendant admitted responsibility for the "unpaid freight" (Count 2). See id. at 3. Finally, it is clear from the face of the service contract that Defendant is liable for at least some detention, demurrage, and destruction charges based upon its admitted abandonment of the cargo (Count 1). The only issue truly debated by the parties on summary judgment was the proper scope of Defendant's liability and the mitigation of damages.

Although Defendant objected generally to a significant number of Plaintiff's factual allegations, bare objections are not sufficient to create a dispute. A non-moving party must put forth evidence and "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Furthermore, the Court did not sustain any of Defendant's evidentiary objections. Plaintiff clearly established a prima facie case for liability, and Defendant provided no new or distinguishing facts, relying instead solely upon meritless evidentiary objections. Therefore, the Court **GRANTED** Plaintiff's Motion for Summary Judgment as to liability, Doc. 19, but proceeded to trial for the proper determination of damages.

### B. Damages

At trial, Plaintiff sought three specific types of damages. First, Plaintiff sought the freight cost of shipping the cargo, equal to 8,820 United States Dollars ("USD"), an amount

Defendant does not contest. Doc. 37 at 2. Second, it sought the daily demurrage costs for depriving Plaintiff of the use of its thirteen containers from July 2013 until April 4, 2014, 2,519,780 Chinese Yuan ("CNY"). Id. Third, Plaintiff sought the actual costs associated with destruction of the cargo once abandoned, 1,513,074 CNY. Id.

### 1. Freight Charges

Plaintiff claims it is owed freight, the contract price for shipment of the cargo, in the amount of 8,820 USD. Id. Plaintiff asserted this claim in its Motion for Summary Judgment, Doc. 20 at ¶ 61, and Defendant did not object or respond to this claim, see Doc. 28 at 3. Defendant also admitted to this charge through deposition, and the evidence presented by both parties at trial clearly supports the accuracy of the amount. See, e.g., Trial Ex. 5 at CMA000106–09. Defense counsel did not contest these damages at trial. See Doc. 33 at 2, 6. Accordingly, the Court **FINDS** that Plaintiff has proven "with reasonable certainty the amount of damages" relating to the freight charges for shipment of the cargo initially identified as "auto parts" and successfully delivered to the Port of Tianjin. See Shepherd, 574 S.E.2d at 524. Therefore, the Court **ORDERS** that Defendant is **LIABLE** for damages relating to freight charges in the amount of 8,820 USD.

### 2. Demurrage Charges

Plaintiff seeks damages relating to demurrage charges from the expiration of the "free time" on each container[6] until April 4, 2014, the date Defendant was invoiced to facilitate the filing of this lawsuit. Using that date, Plaintiff claims to be owed damages in the amount of

---

[6] "Free time" expired on three different dates due to the fact that the cargo arrived at the Port of Tianjin in three separate shipments. The first shipment arrived on June 23, 2013 with five containers. The second arrived on June 30, 2013 with seven containers. The third arrived on July 15, 2013 with one container. See Trial Ex. 5 at CMA000100–05.

2,519,780 CNY. Although Plaintiff claimed at trial that demurrage continued to accrue after April 4, 2014, Plaintiff asked the Court to award damages based upon this invoice.

Defendant disputes Plaintiff's ability to recover "any demurrage" on the basis that Plaintiff failed to properly mitigate damages. Doc. 33 at 6. Defendant asserts that because Plaintiff had physical possession of the cargo, it was the only one in the position to mitigate damages. Defendant alleges that Plaintiff's failure to do so should completely undermine its ability to recover demurrage. Id.

The Court **FINDS**, however, that the evidence does not entirely support either party's position. Defendant's consignee did not pick up the cargo as anticipated in July 2013, see Trial Ex. 13, thereby continuing to occupy Plaintiff's containers and initiating demurrage charges under the service contract. The parties then engaged in a series of e-mail communications seeking to find a resolution. See Trial Exs. 13, 21–22, 24, 34, 39. Defendant's argument that Plaintiff delayed too long before destroying the cargo is severely undermined by these e-mails.

Over the course of their communications, Plaintiff continually instructed Defendant that the only feasible way to proceed was by destroying the tires. See, e.g., Trial Ex. 22. In response, Defendant repeatedly informed Plaintiff that the quoted pricing for destruction was too high, and requested that Plaintiff not proceed with destruction. As a result, Plaintiff cannot reasonably have been expected to destroy the cargo while it still belonged to Defendant.

At trial, Defendant also argued that Plaintiff could have mitigated damages by acting on its right to empty the unclaimed containers for more productive use elsewhere and arranging another means of storage for the cargo. "[M]itigation of damages is an affirmative defense and the party that breached the contract bears the burden of proving that failure by a preponderance of the evidence." Johnson v. Washington, No. 2:07cv204, 2008 WL 850690, at *5 (E.D. Va.

Mar. 12, 2008) (citing Fox-Sadler v. Norris Roofing Co., 229 Va. 106, 112 (1985)). Although it does appear Plaintiff had the right to empty the containers, Defendant failed to meet its burden to prove how or if Plaintiff's failure to act on that right unnecessarily enhanced the overall costs. Accordingly, the Court **FINDS** that Plaintiff is owed some amount of demurrage charges.

In Yang Ming Marine Transp. Corp. v. Okamoto Freighters Ltd., the Ninth Circuit faced a very similar set of facts regarding the issue of demurrage. 259 F.3d 1086, 1088–90 (9th Cir. 2001) [hereinafter Yang Ming]. There, the court held that although the plaintiff-carrier was initially entitled to demurrage upon the expiration of "free time," its ability to recover demurrage ceased when the cargo was officially abandoned. The court reasoned that post-abandonment, plaintiff-carrier could no longer claim to be retaining the containers as a service to defendant-NVOCC. Id. at 1093. The court did, however, permit the plaintiff-carrier to recover the "actual costs it incurred as a result of [defendant-NVOCC]'s misdescription of the cargo." Id. at 1094.

The Court is persuaded to adopt the reasoning of the Ninth Circuit as to the proper scope of demurrage-related damages. Therefore, Plaintiff may recover damages for all demurrage charges incurred between the expiration of "free time" for each container and the date on which the cargo was officially abandoned by Defendant.

As the date of abandonment is necessary for establishing the scope of damages, the Plaintiff bears the burden of proving the actual date. No evidence was offered at trial to establish an exact date; however, the parties agree that Defendant abandoned the cargo in December 2013 or early January 2014. See also Doc. 39 at 1 (trial stipulation stating Plaintiff "is entitled to demurrage charges from July to December of 2013."). Compare Doc. 33 at 3, 6, with Doc. 37 at 4. Since Plaintiff bears the burden of proving damages, it also bears the related risk of nonpersuasion. See Fed. R. Evid. 301. Therefore, as no evidence was offered to establish an

exact date of abandonment,[7] the Court must select an appropriate date that is least prejudicial to Defendant. Accordingly, the Court **FINDS**, based upon the evidence now before it, that the cargo was officially abandoned on December 1, 2013, and Plaintiff can only recover the demurrage damages it seeks for charges incurred prior to that date.

The service contract between the parties incorporated by reference Plaintiff's publically filed Tariff. See Trial Ex. 1 at CMA000114. Accordingly, the demurrage rates maintained in the Tariff are considered to be a part of the contract. See also Louisville & N. R. Co. v. Maxwell, 237 U.S. 94, 98 (1915) ("knowledge of the lawful [tariff] rate is conclusively presumed").

For shipments of forty-foot "HC" containers from the United States to China, the Tariff lists the following schedule for demurrage charges:

| Days Since Delivery of Cargo | Cost to Customer |
|---|---|
| Day One through Day Seven | Free Time |
| Day Eight through Day Fifteen | 190 CNY/Day/Container |
| Day Sixteen through Day Forty | 380 CNY/Day/Container |
| Day Forty-One and Forward | 760 CNY/Day/Container |

Trial Ex. 60 at CMA000241.

The first shipment of cargo arrived on June 23, 2013 with five containers. Trial Ex. 5 at CMA000103–04. This shipment's seven days of "free time" expired on June 29. The first tier of demurrage charges ran from June 30 until July 7. The second tier ran from July 8 until August 1. The third tier ran from August 2 until November 30. The charge for each period, multiplied over five containers, is displayed in the following table:

---

[7] In fact, Plaintiff's counsel specifically avoided any attempt to establish an exact date. See Trial Test. of Ms. Hawkins ("Q. Now, I understand eventually, based on the prior testimony, that sometime in December 2013 the parties parted ways, they couldn't come to a resolution, and the cargo was . . . up to CMA to deal with it? A. Yes.").

exact date of abandonment,[7] the Court must select an appropriate date that is least prejudicial to Defendant. Accordingly, the Court **FINDS**, based upon the evidence now before it, that the cargo was officially abandoned on December 1, 2013, and Plaintiff can only recover the demurrage damages it seeks for charges incurred prior to that date.

The service contract between the parties incorporated by reference Plaintiff's publically filed Tariff. See Trial Ex. 1 at CMA000114. Accordingly, the demurrage rates maintained in the Tariff are considered to be a part of the contract. See also Louisville & N. R. Co. v. Maxwell, 237 U.S. 94, 98 (1915) ("knowledge of the lawful [tariff] rate is conclusively presumed").

For shipments of forty-foot "HC" containers from the United States to China, the Tariff lists the following schedule for demurrage charges:

| Days Since Delivery of Cargo | Cost to Customer |
|---|---|
| Day One through Day Seven | Free Time |
| Day Eight through Day Fifteen | 190 CNY/Day/Container |
| Day Sixteen through Day Forty | 380 CNY/Day/Container |
| Day Forty-One and Forward | 760 CNY/Day/Container |

Trial Ex. 60 at CMA000241.

The first shipment of cargo arrived on June 23, 2013 with five containers. Trial Ex. 5 at CMA000103–04. This shipment's seven days of "free time" expired on June 29. The first tier of demurrage charges ran from June 30 until July 7. The second tier ran from July 8 until August 1. The third tier ran from August 2 until November 30. The charge for each period, multiplied over five containers, is displayed in the following table:

---

[7] In fact, Plaintiff's counsel specifically avoided any attempt to establish an exact date. See Trial Test. of Ms. Hawkins ("Q. Now, I understand eventually, based on the prior testimony, that sometime in December 2013 the parties parted ways, they couldn't come to a resolution, and the cargo was . . . up to CMA to deal with it? A. Yes.").

| Demurrage Tier | Days | Number of Containers | Daily Cost | Cost Incurred |
|---|---|---|---|---|
| Tier One | 8 | 5 | 190 CNY | 7,600 CNY |
| Tier Two | 25 | 5 | 380 CNY | 47,500 CNY |
| Tier Three | 121 | 5 | 760 CNY | 459,800 CNY |
| **TOTAL DEMURRAGE FOR FIRST SHIPMENT** | | | | **514,900 CNY** |

The second shipment of cargo arrived on June 30, 2013 with seven containers. Id. at CMA000100–02. This shipment's seven days of "free time" expired on July 6. The first tier of demurrage charges ran from July 7 until July 14. The second tier ran from July 15 until August 8. The third tier ran from August 9 until November 30. The charge for each period, multiplied over seven containers, is displayed in the following table:

| Demurrage Tier | Days | Number of Containers | Daily Cost | Cost Incurred |
|---|---|---|---|---|
| Tier One | 8 | 7 | 190 CNY | 10,640 CNY |
| Tier Two | 25 | 7 | 380 CNY | 66,500 CNY |
| Tier Three | 114 | 7 | 760 CNY | 606,480 CNY |
| **TOTAL DEMURRAGE FOR SECOND SHIPMENT** | | | | **683,620 CNY** |

The third shipment of cargo arrived on July 15, 2013 with one container. Id. at CMA000105. This shipment's seven days of "free time" expired on July 21. The first tier of demurrage charges ran from July 22 until July 29. The second tier ran from July 30 until August 23. The third tier ran from August 24 until November 30. The charge for each period, multiplied by one container, is displayed in the following table:

| Demurrage Tier | Days | Number of Containers | Daily Cost | Cost Incurred |
|---|---|---|---|---|
| Tier One | 8 | 1 | 190 CNY | 1,520 CNY |
| Tier Two | 25 | 1 | 380 CNY | 9,500 CNY |
| Tier Three | 99 | 1 | 760 CNY | 75,240 CNY |
| TOTAL DEMURRAGE FOR THIRD SHIPMENT | | | | 86,260 CNY |

As represented in the preceding tables, the Court **FINDS** that Plaintiff has proven "with reasonable certainty" that the recoverable demurrage for all thirteen containers from delivery until abandonment is 1,284,780 CNY. See Shepherd, 574 S.E.2d at 524. Ordinarily, however, the Court should "enter judgments in U.S. dollars." ReliaStar Life Ins. Co. v. IOA Re, Inc., 303 F.3d 874, 882 (8th Cir. 2002). Accordingly, the appropriate exchange rate of CNY to USD must be determined.

The proper date to select an exchange rate is the date of the breach. Elite Entm't, Inc. v. Khela Bros. Entm't, Inc., 396 F. Supp. 2d 680, 694 (E.D. Va. 2005). Here, the Court **FINDS** that the date of abandonment, December 1, 2013, is also the date the contract was breached. The Court therefore takes judicial notice that at the close of business on Friday, November 29, 2013, the applicable exchange rate was 0.16416 CNY to 1 USD.[8] Applying this rate of exchange to the aforementioned total, the Court hereby **ORDERS** that Defendant is **LIABLE** for damages relating to demurrage charges in the amount of 210,909.48 USD.

### 3. Destruction Costs

Despite being unable to collect demurrage charges after abandonment, Plaintiff may still recover any actual costs incurred as a result of Defendant's breach. See Yang Ming, 259 F.3d at 1093. Plaintiff requests these damages in the form of destruction costs, inspection fees, and

---

[8] Data gathered from CHINA RENMINBI-US DOLLAR Exchange Rate, BLOOMBERG BUSINESS, http://www.bloomberg.com/quote/CNYUSD:CUR/chart (last visited Mar. 6, 2015).

storage charges. At trial, Plaintiff offered into evidence an e-mail from Plaintiff's employee, Maria Soto, to Defendant's employee, Eric Ngo, which provided cost estimates for destruction of the cargo. Trial Ex. 39. Uncontroverted witness testimony confirmed that these estimates accurately reflected the actual costs later incurred by Plaintiff. See Trial Test. of Ms. Hawkins.

The cost to physically destroy the used tires was quoted to Defendant as "CNY4,000/TON." Trial Ex. 39. The Bills of Lading confirm that the cargo weighed a total of 325,000 kilograms or 325 metric tons. Trial Ex. 3 at CMA000199, 201, 203. Accordingly, destruction of the used tires cost Plaintiff a total of 1,300,000 CNY. Applying the exchange rate previously determined by the Court, this equals 213,408.00 USD.

The cost of inspection fees was quoted to Defendant as "CNY2000/CNTR."[9] Trial Ex. 39. The Bills of Lading confirm that the cargo was shipped in a total of thirteen containers. Trial Ex. 3 at CMA000199, 201, 203. Accordingly, the inspection of these thirteen containers cost Plaintiff a total of 26,000 CNY. Applying the exchange rate previously determined by the Court, this equals 4,268.16 USD.

The storage fees quoted to Defendant were "CNY8/[CNTR]/day . . . increased to CNY24/[CNTR]/day if idle over [three] months." Trial Ex. 39. Since Plaintiff is receiving demurrage as compensation for storing the containers until abandonment, damages for storage costs will be calculated from December 1, 2013 until the tires were destroyed. Deposition testimony used at trial indicates that the actual destruction of tires began on December 17, 2014, see Trial Test. of Emma Sun, a period of 382 days after abandonment. As the cargo was idle for well over three months prior to abandonment, the Court will use the 24 CNY per container per

---

[9] Testimony at trial clouded this issue, as Ms. Hawkins identified a relevant typographical error in Exhibit 2. This Exhibit states that the inspection fees were estimated at "8,40.00," but Ms. Hawkins did not clarify if the correct amount was 840 USD or 8,400 USD. She did, however, indicate that the Exhibit's cost estimates were drawn from the figures contained in Exhibit 39, and that Exhibit 39 accurately reflects the costs incurred. Therefore, the Court relies on Exhibit 39, rather than Exhibit 2, in determining the appropriate amount of damages.

day charge, amounting to a total storage cost of 9,168 CNY. Applying the exchange rate previously determined by the Court, this equals 1,505.02 USD.

Based upon the foregoing evidence, the Court **FINDS** that Plaintiff has proven "with reasonable certainty" its actual costs post-abandonment. See Shepherd, 574 S.E.2d at 524. The Court hereby **ORDERS** that Defendant is **LIABLE** for damages relating to destruction, inspection, and storage costs in the amount of 219,181.18 USD

### C. Defendant's Pretrial Motions

Defendant filed both a Motion to Strike the Declaration of Ms. Hawkins from Plaintiff's Summary Judgment Motion and a Motion in Limine to prevent her from testifying at trial. See Docs. 21, 25. Both motions rest on the same principal argument, namely that Ms. Hawkins' testimony does not come from her direct or personal knowledge and is, therefore, inadmissible.

Plaintiff asserted that the motions should be denied because Ms. Hawkins testified as a 30(b)(6) corporate designee. The Federal Rules are clear that such a witness "must testify about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). This acts as an exception to the general principle that a witness must have personal knowledge, and the deposition transcript cited by Plaintiff clearly indicated that this was Ms. Hawkins role and that she was aware of that distinction. Doc. 31 at 2. Furthermore, the Court took the matter under advisement after the Final Pretrial Conference, and although Ms. Hawkins did testify at trial, the objection was not renewed.

The Motion to Strike is also deficient on procedural grounds. Such a motion is only proper in reference to "material included in a pleading." Gregory v. Belfor USA Grp., No. 2:12cv11, 2012 WL 2309054, at *2 (E.D. Va. June 15, 2012). The material that Defendant sought to strike is not attached to a pleading, but to Plaintiff's Motion for Summary Judgment.

Accordingly, the Court **DENIES** Defendant's Motion to Strike, Doc. 21, and Motion in Limine, Doc. 25, both procedurally and on their merits.

## IV. CONCLUSION

For the foregoing reasons, Court **GRANTED** the Motion for Summary Judgment, Doc. 19, as to liability but not as to damages, **DENIED** Defendant's pre-trial Motions, Docs. 21, 25, and **FINDS** Defendant **LIABLE** for damages in the total amount of $438,910.66.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
March 16, 2015